WINDWARD TRADERS, LTD., a Cayman Islands Company,
Plaintiff–Appellant, Cross–Appellee,

v.

FRED S. JAMES & COMPANY OF NEW YORK, INC., and P.W. Kininmonth, Ltd., Defendants–Appellees,

American Centennial Insurance Company, Defendant–Appellee, Cross–Appellant.

WINDWARD TRADERS, LTD., a Cayman Islands Company,
Plaintiff–Appellee,

v.

FRED S. JAMES & COMPANY OF NEW YORK, INC., and P.W. Kininmonth, Ltd., Defendants,

American Centennial Insurance Company, Defendant–Appellant.

Nos. 87–5522, 87–6063 and 88–5439.

United States Court of Appeals, Eleventh Circuit.

Sept. 22, 1988.

---

William B. Milliken, Hayden and Milliken, Miami, Fla., for Windward Traders, Ltd.

Hendrik G. Milne, Squire, Sanders & Dempsey, Miami, Fla., for P.W. Kininmonth, Ltd.

Mozelle Willmont Thompson, Skadden, Arps, Slate, Meagher & Flom, New York City, for Fred S. James.

Douglas H. Stein, Blackwell, Walker, Fascell & Hoehl, Miami, Fla., for American Centennial Ins. Co.

Before HILL and ANDERSON, Circuit Judges, and THOMAS *, Senior District Judge.

* Honorable Daniel H. Thomas, Senior U.S. District Judge for the Southern District of Alabama, sitting by designation.

1. Windward purchased the vessel in the summer of 1979.

PER CURIAM:

## I. FACTS

Windward Traders, Ltd. ("Windward") contacted Fred S. James & Company of New York, Inc. ("James") in March 1980 to renew the $200,000 marine insurance coverage on Windward's vessel, the WINDWARD TRADER ("the vessel"). James was an insurance broker that had expertise in marine insurance. James had procured the preceding year's insurance on the vessel for the vessel's previous owner.[1] When it contacted James regarding renewal coverage, Windward informed James that the vessel was operating outside the Caribbean waters.[2]

James procured the requested coverage by placing 30.5% of the exposure (i.e., $61,-000) with American Centennial Insurance Company ("American Centennial") and the remaining 69.5% (i.e., $139,000) with various British underwriters ("British market"), including the underwriters at Lloyds. James arranged the American Centennial coverage through James International Treaty Corporation, whom the parties stipulated was American Centennial's agent, and the British market coverage through P.W. Kininmonth, Ltd. ("Kininmonth"), a British insurance broker somewhat comparable to James. The district court found that Kininmonth acted solely as Windward's agent in procuring coverage with the British market. The parties agree that at no time did James notify the underwriters—American Centennial and the British market—or Kininmonth of the vessel's location.

The coverage went into effect on March 4, 1980. March 27, 1980, James sent Windward a written confirmation letter ("cover letter") which outlined the terms of the coverage. The cover letter was the only written insurance document received by

2. James' primary defense at trial was that Windward had not informed it of the vessel's location. The district court found that Windward notified James when it requested renewal of the insurance that the vessel was outside of Caribbean waters. James does not contest this finding on appeal.

Windward and the district court held that it constituted the entire insurance policy among the parties. The propriety of this finding is not contested on appeal. The cover letter was mailed from James' New York office to Windward's office and principal place of business in the Ft. Lauderdale, Florida area.

The cover letter was a printed form on James' letterhead. Certain descriptive details of the coverage, such as the insured's name, the amount of coverage, and the policy period, were handtyped in the spaces provided on the printed form. One handtyped portion of the cover letter identified the underwriters as "the British market thru Kininmonth, 69.5%" and "American Centennial Insurance Co. thru James International Treaty, 30.5%." A printed clause on the cover letter stated that the coverage was "subject to the general conditions and trading warranties as set forth on the back hereof." Handtyped on the back of the cover letter was the following:

> This insurance is subject to the following clauses and special provisions:
>
> > American Institute Hull Clauses ...
> >
> > Trading: warranted Caribbean trading or held covered at additional premium to be advised
>
> .    .    .    .    .
>
> > New York Suable Clause.

The American Institute Hull Clauses (AIH Clauses) referenced in the handtyped portion of the cover letter are standardized clauses commonly used in marine insurance and generally are set forth in a printed form designed to be attached to the insured's policy. Two of the clauses are relevant to this action:

> [1]  The terms and conditions of the following clauses are to be regarded as substituted for those of the policy to which they are attached ...
>
> [2]  The Vessel is held covered in case of any breach of conditions as to ... locality ..., provided (a) notice is given to the Underwriters immediately following receipt of knowledge thereof by the Assured, and (b) any amended terms of cover and any additional premium re-

quired by the Underwriters are agreed to by the Assured.

The parties agree, however, that James sent only the cover letter to Windward. Windward was never sent a copy of the AIH Clauses or the New York Suable Clause referenced in the cover letter.

Kininmonth issued two cover notes to James on April 16, 1980, which confirmed the details on Kininmonth's placement of the insurance with the British market on behalf of James and Windward. One cover letter indicated that 42.648% of the 69.5% of Windward's total coverage procured by Kininmonth was "EFFECTED WITH: Underwriters at Lloyds." The other cover letter specified that the remaining 57.352% of British coverage was "EFFECTED WITH: Insurance Companies as per schedule attached." The attached typewritten schedule identified 23 separate insurers and the percentage of coverage each underwrote. James did not send the Kininmonth cover letters to Windward.

The vessel sank off the coast of Portugal on May 29, 1980. The brokers and underwriters were promptly notified. Apparently, this was the first notice the underwriters and Kininmonth had that the vessel was outside its warranted Caribbean trading area.

## II.  PROCEDURAL BACKGROUND

Through James and Kininmonth, Windward filed a claim with each underwriter. The underwriters denied coverage on the basis that Windward had violated the AIH "held-covered" clause by failing to immediately notify them when the vessel left Caribbean waters. Windward subsequently brought this action against American Centennial, James, and Kininmonth, seeking to recover $200,000 as damages, the amount of coverage under the insurance agreement. Windward asserted that the defendants were jointly and severally liable for the requested damages.

Windward's claim against American Centennial was that the coverage was in effect when the boat sank because under the terms of the cover letter Windward received from James, notification that the

trading warranty had been breached was not necessary to continue coverage. Windward's claim against Kininmonth was that Kininmonth acted as the agent for an undisclosed principal (the British market), that the British market was responsible for coverage for the same reasons asserted in Windward's claim against American Centennial, and that under agency law, Kininmonth therefore was liable for its undisclosed principal's share of the coverage. Windward's claim against James was that James had a duty as Windward's agent to procure and maintain the requested insurance, and that it breached this duty by failing to inform the underwriters that the vessel was outside Caribbean waters.

The district court held that the vessel was covered when it sank. The court reasoned that the "held-covered" clause of the cover letter and the AIH "held-covered" clause referenced by the cover letter conflicted with respect to the notification requirement and that the conflicting provisions had to be interpreted in favor of the insured, Windward. Thus, the district court held that Windward had no obligation to notify the underwriters when the vessel breached the trading warranty and therefore that the coverage was in effect when the vessel sank off the coast of Portugal, well outside its warranted trading area of the Caribbean. Based on these conclusions, the district court allowed Windward's claim against American Centennial. The district court later assessed Windward's attorney's fees against American Centennial in accordance with § 627.428 of the Florida Insurance Code, which allows an insured who successfully litigates a claim against its insurer to recover attorney fees.[3]

The district court denied Windward's claim against James because of its conclusion that the insurance was in effect when the boat sank. The district court reasoned that James' negligence, if any, in failing to report the vessel's location to the under-

writers did not result in a breach of its duty to procure insurance on the vessel.

With respect to Kininmonth, the district court concluded that it had acted as Windward's agent rather than as agent for the British market in placing the insurance. The district court also concluded that even if Kininmonth had acted as the British market's agent, it had adequately disclosed the identity of its alleged principal in the two cover letters it issued to James, Windward's agent. Thus, the district court held that Kininmonth was not the agent of an undisclosed principal and denied Windward's claim against Kininmonth.

American Centennial appeals the judgment entered against it. It also appeals the attorney fee award. Windward cross-appeals the denial of its claims against James and Kininmonth.

## III. DISCUSSION

### A. *American Centennial*

The focus of the litigation against American Centennial in the district court was on whether the trading warranty/held-covered clause of the cover letter James sent to Windward conflicted with the held-covered clause of the AIH Clauses referenced by the cover letter. An additional concern in the proceedings below was which clause controlled if the clauses conflicted. As discussed above, the district court held that the clauses conflicted and that the cover letter clause controlled.

■ We affirm the district court's conclusion that the insurance was in effect when the vessel sank, but we do so on different grounds.[4] The parties stipulated that Florida substantive law applies. Section 627.409(2) of the Florida Insurance Code provides that:

(2) A breach or a violation by the insured of any warranty, condition, or provision of any wet marine or transportation insurance policy, contract of insurance, endorsement, or application therefore shall

---

3. The parties stipulated that Florida substantive law applied.

4. We therefore express no opinion with respect to the district court's conclusion that the claims conflicted and that the cover letter held-covered clause controlled.

not render void the policy or contract, or constitute a defense to a loss thereon, unless such breach or violation increased the hazard by any means within the control of the insured.

As a Florida court explained, "[t]he statute is designed to prevent the insurer from avoiding coverage on a technical omission playing no part in the loss." *Pickett v. Woods*, 404 So.2d 1152, 1153 (Fla.App. 1981).

We assume *arguendo* that the AIH held-covered clause was in full effect, i.e., that Windward was required to immediately notify the underwriters of any breach of the locality warranty in order to maintain coverage. The parties agree that although James was notified, the underwriters were never notified that the vessel was outside Caribbean waters, its warranted trading locality.

This breach of the notification provision clearly did not increase the hazard to the vessel.[5] In addition, its failure to notify the underwriters obviously played no part in causing the loss. Thus, requiring American Centennial to pay its share of the coverage despite the breach of the notification provision fully accords with the purpose of § 627.409(2) as that statute is interpreted by the Florida courts. *See id.* Therefore, pursuant to the provisions of § 627.409(2) of the Florida Insurance Code, we hold that American Centennial is precluded from denying coverage to Windward solely because Windward failed to notify them of the vessel's location.

■ American Centennial urges that § 627.409(2) does not apply because the insurance policy was not delivered or issued for delivery in Florida. American Centennial points out that § 627.401(2) of

the Florida Insurance Code states that the provisions of the Insurance Code (including § 627.409(2)) do not apply to "policies or contracts not issued for delivery in this state nor delivered in this state...."

Contrary to American Centennial's assertion that the policy was delivered in New York, the evidence in the record indicates that the cover letter—which the district court found (and the parties do not contest) constitutes the entire insurance agreement among the parties—was both issued for delivery to Florida and was actually delivered in Florida. At trial, Windward's president testified that the cover letter was mailed to Windward in Florida. Moreover, the inside address typed on the cover letter indicates that it was issued for delivery in Florida. The inside address indicates that the cover letter was sent to:

Mr. Bestwina

Windward Traders, Ltd.

c/o Harrington & Co.

Attn: Richard F. Ralph, Jr.

P.O. Box 13028

Port Everglades, Florida 33316

American Centennial has not directed our attention to any other facts in the record which indicate that the policy was not delivered in Florida. Thus, it is clear to us that the policy was both issued for delivery in Florida and was actually delivered to Florida.

Nevertheless, American Centennial asserts that the parties' intent, evidenced by the New York Suable Clause referenced in the cover letter, was that the policy was issued for delivery and actually delivered in New York City. The New York Suable Clause provides, in relevant part:

5. It might be argued that a breach of the trading (locality) warranty—e.g. operating the vessel off the coast of Portugal, rather than in Caribbean waters—may have "increased the hazard by any means within the control of [Windward]." Section 627.409(2). However, coverage was denied solely because Windward failed to notify the underwriters of the vessel's location; it was not denied because the vessel was outside the Caribbean. Moreover, under the instant policy, a breach of the locality warranty would not have been a valid reason to deny coverage because

the policy stated that the vessel was held covered if it breached the locality warranty, provided that the proper notification was given to the underwriters (and any additional premium assessed was paid). Thus, even if in theory a breach of a trading warranty would be a valid reason under Florida law for a marine insurer to deny coverage, it would not be a valid reason in this case given the express terms of the insuring agreement (i.e., the cover letter and referenced AIH Clauses).

The place of physical and actual delivery and delivery of this policy is the City of New York. Nevertheless, at the option of the assured as between the assured and the assurers the place of issue and delivery of the policy shall be considered the City of New York and all matters arising hereunder shall be determined in accordance with American law and practice. Any suit hereon may be brought against these insurers in any court in the state of New York.

The clause is a printed form, except that in the first sentence quoted above, a blank is provided for the name of the actual place of delivery to be inserted. In the copy of the New York Suable Clause presented as evidence at trial, "New York" had been inserted in this blank. Apparently, the New York Suable Clause typically is used when a policy which insures American interests is actually issued and delivered in a foreign city, typically London. The clause allows the assured party (i.e., the Americans) to bring suit in American courts and to have American law apply in the event litigation against the (typically foreign) insurers becomes necessary.[6]

Assuming that the clause retains any useful meaning in the circumstances of this case, we hold that the parties' stipulation evidenced therein that the policy was actually delivered and issued to be delivered in New York does not override the undisputed actual evidence in this case that the cover letter (the only policy in the case) was *in fact* issued for delivery and delivered to Windward in Florida. Consequently, with respect to the application of § 627.401(2), which limits the application of the Florida Insurance Code to policies issued for delivery in or actually delivered in Florida, we hold that the parties cannot contractually stipulate against the actual facts that occur in the case. In other words, the parties cannot stipulate that the place of delivery and issue of the policy is different from what it actually was.[7]

■ American Centennial also challenges the award of $22,000 attorney's fees to Windward for the same reason that it challenged the application of § 627.409(2), namely that because of the New York Suable Clause, the policy was not issued for delivery or delivered in Florida.[8] Section 627.428 of the Florida Insurance Code allows an insured to recover attorney's fees

---

6. For a thorough discussion of the New York Suable Clause, *see Thebes Shipping, Inc. v. Assicurazioni Ausonia Spa,* 599 F.Supp. 405, 422–25 (S.D.N.Y.1984). The district court in that case explained that "the policies are on forms used by the London insurance industry and, presumably in order to make insurance more saleable to large American customers, these policies enable an insured not only to sue the insurer in the United States but also (at the option of the assured) to have American law applied." *Id.* at 422.

7. In its initial brief in this case, American Centennial relied entirely upon its New York Suable Clause argument. In its reply brief, American Centennial again relied primarily on the New York Suable Clause argument, but added in a single sentence that the policy itself, under the actual facts of the case, was delivered to James in New York. Apparently, although American Centennial does not state anything further with respect to its claim that the policy was actually delivered in New York, American Centennial is referring to the actual insurance policy which it drew up and delivered at a later date to James. However, even if that later policy actually was delivered to James in New York, the district court found that the cover letter constituted the entire insurance agreement between the parties,

and American Centennial has not contested this finding on appeal. In fact, it expressly stated that it agreed with the district court that the cover letter was the only insurance agreement among the parties. Thus, American Centennial's single sentence referring to actual delivery of the policy in New York is merely conclusory and is contrary to the undisputed record evidence.

Moreover, · even assuming *arguendo* that American Centennial actually did deliver some sort of insurance policy to James in New York, it remains true that the cover letter, which was the insuring agreement, was sent to Windward in Florida. Under Florida law, it is clear that where the actual insurance policy is delivered outside of the state, but some evidence of insurance (such as an insurance certificate) is delivered to the insured who resides in Florida, the policy is held to have been delivered in Florida for purposes of the Florida insurance statutes. *See East Coast Ins. Co. v. Cooper,* 415 So.2d 1323, 1325 (Fla.App.1982).

8. The parties stipulated as to the amount of the attorney's fees and this is not an issue on appeal.

from its insurer if it successfully litigates a claim against the insurer. However, the attorney fee statute applies only to policies issued for delivery or delivered in Florida, pursuant to § 627.401(2), the statute addressed above. As we held in the above discussion, the policy in this case was both issued for delivery and delivered to Windward in Florida. Therefore, we affirm the attorney fee award.

### B. *James*

■ Windward contends that James failed to procure and maintain the insurance coverage by negligently failing to inform the underwriters of the vessel's location. In light of our above holding that the vessel was insured when it sank, James fulfilled its alleged duty to procure and maintain the requested insurance. We therefore affirm the district court's judgment in favor of James.

### C. *Kininmonth*

■ Windward asserted that Kininmonth acted as the agent for an undisclosed principal—the British market—and therefore is liable for its principal's share of the coverage. The district court held that Kininmonth was not an agent of the British underwriters and that even if it were, it adequately disclosed their identities in the cover letters it sent to James, Windward's agent.

We agree with the district court's conclusion that Kininmonth adequately identified the insurers in the cover letters it sent to James and that because James was Windward's agent, Windward had constructive notice of these identities. We therefore affirm the district court's judgment in favor of Kininmonth.[9]

AFFIRMED.

---

**9.** We assume *arguendo*, but expressly do not decide, that the undisclosed principal theory of liability could have been applied if Kininmonth had failed to identify its principals, but we note that Windward never labored under any misunderstanding that it was dealing directly with Kininmonth as a principal. Windward was at all times aware that Kininmonth was representing London underwriters. Also, we do not address the propriety of the district court's conclusion that Kininmonth was an agent solely of Windward because even if Kininmonth was the underwriters' agent, it adequately disclosed their identity.